**UNITED STATES**

v.

**Airman Phillip A. MASLANICH, FR 187–50–6603 United States Air Force.**

**ACM 23265.**

U. S. Air Force Court of Military Review.

Sentence Adjudged 10 June 1981.

Decided 2 April 1982.

---

Appellate Counsel for the Accused: Colonel George R. Stevens and Major Willard K. Lockwood. Captain Jeffrey D. Billett filed a brief on behalf of the accused.

Appellate Counsel for the United States: Colonel James P. Porter and Major George D. Cato.

Before POWELL, KASTL and MAHONEY, Appellate Military Judges.

## DECISION

PER CURIAM:

The accused was tried by general court-martial for aggravated assault, escape from confinement, and desertion, in violation of Articles 128, 95, and 85, Uniform Code of Military Justice, 10 U.S.C. §§ 928, 895, 885, [hereinafter, U.C.M.J.]. Despite pleas of not guilty, he was found guilty of all specifications by a military judge sitting alone. His sentence was a bad conduct discharge, confinement at hard labor for nine months, forfeiture of $100.00 per month for nine months, and reduction to airman basic. We affirm.

### Facts

On 5 April 1981, the accused's automobile was stopped for a routine vehicle inspection at the main gate of Dyess Air Force Base, Texas. When the vehicle was stopped, the accused declined to shut off his engine and maneuvered the car erratically, alternating rapid acceleration with screeching stops. His first forward movement forced a security policeman to jump on the hood of the car to avoid being run down; he clung there at considerable peril to avoid being thrown off during the wild maneuvers of the accused's car.

As a result, the accused was apprehended for the aggravated assault of which he stands convicted. He was placed in pretrial confinement. A hearing on that status was scheduled for 7 April 1981. On that morning, his first sergeant receipted for him on DD Form 629, Confinement Order, which indicated that the accused was a medium custody prisoner who required "unarmed supervision at all times." The first sergeant escorted the accused to the base legal office, where charges were preferred and to the area defense counsel's office, where he left the accused to consult with his counsel. Later in the morning, at the request of the defense counsel, the first sergeant took the accused to the dining hall for lunch and to his off-base apartment to clean up for the hearing. Prior to getting into the vehicle to return to base, the accused paused and asked the first sergeant, "How would you

like to go back without me?" The first sergeant responded in the negative and drove the accused back to the base.

Once at the area defense counsel's outer office, the accused stated that he was thirsty. The first sergeant stepped into the hallway and watched the accused get a drink of water and return. The first sergeant left the accused with the area defense counsel, Captain J, and departed for lunch. Captain J does not recall if the first sergeant specifically asked permission to leave for lunch. The first sergeant relates that he turned the accused over to Captain J before departing but did not brief that officer on the requirement for constant supervision.

When the first sergeant left, Captain J was seated at a desk engaged in legal research; the accused was seated across from the desk in a chair near an air conditioning unit. No one else exercising restraint over the accused was present in Captain J's outer office or elsewhere in the building. At one point, the accused asked Captain J if he could get a drink of water. Captain J does not recall making any response to the accused's request. According to Captain J's testimony, the fountain "was a relatively great distance down the hallway." The accused got up, left the office and departed the building.

After absenting himself the accused went to the post office to pick up his mail. He then went to another squadron's barracks to find a place to "think" for awhile. Unsuccessful in finding a vacant room, he got a ride from an acquaintance in that barracks. He told the acquaintance that he had escaped and wanted a ride to his car at the front gate, but to go out the back gate of the base because the security police might be looking for him. They drove out of the back gate, around the base to the vicinity of the front gate, where his car was still parked. The accused told his friend to say, if anyone asked, that he had picked the accused up hitchhiking outside the back gate. When his friend dropped him off near his car at the main gate, the accused was wearing fatigue pants; his outer shirt was tied around his waist; and he was not wearing a hat.

The main gate guard, who had been alerted to be on the lookout for the accused, had the car under observation. As he saw the accused approach his car with keys in hand, the guard also moved toward the car. Observing this, the accused slammed the car door and ran. Subsequently, the accused hitchhiked a short distance, and was found walking eastward, toward town, when he was stopped by a Taylor County, Texas, deputy sheriff.

The sheriff had been alerted to be on the lookout for an escaped airman from Dyess. The sheriff noticed that the accused was walking rather fast, and that he fit the radio description of the escapee. The accused was wearing his fatigue jacket at the time, but had no identification card with him, which was understandable since he had been in confinement. When asked his name, the accused gave a fictitious identity and said he had just gotten off work. He also refused to let the sheriff see the letters sticking out of his jacket pocket. At that point the sheriff detained the accused, and radioed to have someone from security police respond to his location for positive identification. Then, at the accused's request, the sheriff drove across the street to a gas station and let the accused go to the restroom. When the accused came back out, he acknowledged his true identity and requested to be taken back to the base.

### Escape From Confinement

Having analyzed the precedents[1] and heard oral argument, we affirm the ac-

---

1. Concededly, the reported cases do not align logically into any sensible and consistent pattern. As the Navy Board aptly noted in *United States v. Vincent*, 24 C.M.R. 506 (N.B.R.1957), the Code proves "laconic" in any search for clean solutions to these problems.

One factor often used by the appellate courts is an assessment of how much physical restraint at the moment of escape is sufficient to uphold a conviction. As the *Vincent* decision stresses, the cases are in disarray and the degree of restraint in reported cases "has some-

cused's conviction of escape from confinement. *United States v. Dees*, 45 C.M.R. 891 (N.C.M.R.1972); *United States v. Vincent*, 24 C.M.R. 506 (N.B.R.1957). *See generally, United States v. Stewart*, 17 C.M.R. 805, 810–811 (A.F.B.R.1954); *United States v. Conner*, 7 C.M.R. 477, 479–480 (A.F.B.R. 1952); *United States v. Connor*, 40 C.M.R. 614 (A.C.M.R.1969). *See also, United States v. Roberts*, 43 C.M.R. 998 (A.F.C.M.R.1971).

The offense of escape from confinement is discussed in the Manual for Courts-Martial, 1969 (Rev.) at paragraph 174*c*. That paragraph states:

c.  ESCAPE FROM CONFINEMENT

Discussion. See 174*b*. An escape may be either with or without force or artifice, and either with or without the consent of the custodian. *Any completed casting off of the restraint of confinement, before being set at liberty by proper authority, is an escape from confinement, and lack of effectiveness of the physical restraint imposed is immaterial to the issue of guilt.* An escape is not complete until the prisoner has at least momentarily freed himself from the restraint of his confinement; so, if the movement toward escape is opposed, or before it is completed an immediate pursuit follows, there will be no escape until opposition is overcome or pursuit is shaken off.... [emphasis added].

We find that the accused was properly in confinement and that no one in authority duly released him from that status. Thus, within the plain meaning of the Manual, *supra*, we find the offense of escape from confinement established. To say that the accused's success in reaching the water fountain somehow freed him from the status of confinement beggars logic. His physical restraint was not lifted by anyone in authority; though such restraint was ineffectively maintained, the degree of its effectiveness is immaterial.[2] *United States v. Hodge*, 50 C.M.R. 445, 448 (A.F.C. M.R.1975); *United States v. Roberts* and *United States v. Conner*, both *supra*. *See also, United States v. Holcomb*, 16 C.M.R. 537, 541–542 (A.F.B.R.1954). Therefore, we believe the brief absence of the first sergeant and the mix-up or inattentiveness in transferring responsibility for the accused to the area defense counsel cannot be construed as setting the accused at liberty.

We recognize that some cases have held to the contrary.[3] To the extent Air Force cases so hold, they are overruled.[4]

### Desertion

We have carefully evaluated the evidence bearing upon the accused's conviction of desertion and, like the trial judge, we too

---

times been more illusory than real." *United States v. Vincent, supra*, at 514.

2.  Manual for Courts-Martial, 1969 (Rev.), paragraph 174*c*. Factually, the instant case closely parallels two Army decisions during World War II. In each, prisoners were permitted to go to the latrine, unescorted; they escaped and were convicted of *escape from custody*. *United States v. Van Breeman*, 8 B.R. (E.T.O.) 405, 409–410 (1944) and *United States v. Miller*, 34 B.R. 119, 121, 125 (1944). These two cases were cited with approval in a case affirming an *escape from confinement* where the cell door was unlocked and the accused permitted freedom of movement. See *United States v. Binegar*, 4 C.M.R.(A.F.) 472, 480–481 (1951).

3.  *See*, for example, *United States v. Silk*, 37 C.M.R. 523 (A.B.R.1966); *United States v. Hamilton*, 75 B.R. 331, 336–337 (1948); *United States v. Gilchrest*, 1 B.R. 297, 298 (1930).

Some cases from the same service are not easily reconciled. For example, *compare, United States v. Silk, supra*, with *United States v.*

Connor, 40 C.M.R. 614 (A.B.R.1969). *See also, United States v. Holcomb*, 16 C.M.R. 537, 541 (A.F.B.R.1954) and *United States v. Wesson*, 9 C.M.R. 839, 843 (A.F.B.R.1953).

These cases—wrongly, we believe—seem to require physical restraint, actively exercised at the exact moment of the incident. The underlying theory falls apart when convictions are upheld in cases where guards are sleeping or intoxicated. *See e.g., United States v. Roberts*, 43 C.M.R. 998 (A.F.C.M.R.1971) and *United States v. Lorey*, 14 C.M.R. 393 (A.B.R.1954). In any event, the fact that a guard absented himself or is not wide-awake in performing his duties is insufficient to set a prisoner at liberty.

4.  We believe any contrary holding would defeat the laudable goal of permitting chaplains, doctors, and judge advocates to minister to, treat, or counsel prisoners without having an escort constantly present. *See, United States v. Felty*, 12 M.J. 438, 441, note 4 (C.M.A.1982).

are convinced beyond a reasonable doubt of the accused's intent to remain permanently away from the Air Force.

While the facts listed earlier in this opinion constitute a fairly comprehensive chronology of events, there are yet other factors bearing upon the accused's intent which are relevant to our conclusion. Until his assault upon the security policeman, the accused was pending imminent administrative discharge. Indeed, when asked about his motivation at the time of the assault, the accused testified "I was getting out at the time, and I was tired and I wanted to get home. I didn't want to have any hassle." Also in testimony, the accused acknowledged that at the time he absented himself he had been advised of the maximum punishment for the offense upon which he was being held in pretrial confinement, and that he knew his administrative discharge was being held in abeyance pending the result of the court-martial.

Although the record lacks an express declaration from the accused that he intended to remain away permanently, and although he was apprehended a short distance from the base within a couple of hours of his escape, we find overwhelming circumstantial evidence that the accused intended, at some point during his absence, to never return to the Air Force. *First*, the accused was pending a hearing for return to pretrial confinement. *Second*, he was facing a court-martial on a serious charge. *Third*, while those matters were pending, he escaped from confinement, thereby initiating his absence. *Fourth*, he knew his discharge from the Air Force would have to await the outcome of that trial. *Fifth*, the accused suggested to the first sergeant that he leave the accused at his apartment. *Sixth*, the accused managed at some point after leaving the confinement facility to acquire a spare key to his car. *Seventh*, the accused's second trip to the water fountain was not likely generated by a desire to quench his thirst. *Eighth*, he picked up his mail. *Ninth*, he sought a place of refuge in a barracks where he would not likely be discovered. *Tenth*, when unsuccessful, he got a ride to his car, and instructed the driver to lie about having assisted him. *Eleventh*, when confronted near his car by the security policeman, the accused ran (this was actually the third time the accused ran when confronted by authority— the first was at the main gate when he committed the assault; the second was when he took flight prior to the pretrial confinement hearing). *Twelfth*, when sighted by the sheriff, the accused was continuing toward town and away from the base at a fast pace. *Thirteenth*, when confronted by the sheriff, the accused gave a false identity. *Fourteenth*, prior to admitting his identity, the accused asked for and was given permission to use a service station restroom; only when that last possible avenue of escape apparently proved to be a dead end did the accused admit his identity to the sheriff.

With due respect for the opinion of our dissenting brother, we do not find the accused to have been confused in his goal. We find he used considerable foresight and ingenuity in exhausting all reasonable avenues of escape when confronted by authority. Considering the facts, and all reasonable inferences to be drawn therefrom, we have no hesitancy in concluding beyond a reasonable doubt that the accused is guilty of desertion.

The findings of guilty and the sentence are correct in law and fact and, based upon the entire record, are

AFFIRMED.

KASTL, Judge (concurring in part and dissenting in part):

I agree with all aspects of the majority opinion, except that affirming the conviction of desertion. I would find the accused guilty of the lesser included offense of absence without leave, in violation of Article 86, U.C.M.J., 10 U.S.C. § 886. In particular, I note the following factors: (a) when departing the base, the accused's outer uniform shirt was tied around his waist, but when stopped he was wearing it; (b) his first reaction when leaving his defense counsel was to seek a barracks room to

think for awhile—not to run; (c) he admitted to the deputy sheriff that he was the one military authorities were seeking; and (d) with regard to time and distance, he was found walking toward town within two hours of his leaving the installation. Also persuasive are inferences to be drawn from the record, such as the fact that the accused had an apartment in town but there is no evidence he visited it with an eye to perfecting his escape; he was not found at a bus terminal or hitchhiking away from the base; he had not obtained civilian clothing; and, despite instructing his confederate to lie about having aided him, the accused was silent regarding his plans at a time it might have been expected for him to speak.

The majority makes valid observations about the accused's conduct. Admittedly, they reveal an obvious intent to go AWOL. However, the record appears to me to reveal a confused airman who had not yet made up his mind as to *permanently* departing.