**UNITED STATES**

v.

**Airman Christopher A. FELIX, FR566–11–8921, United States Air Force.**

**ACM S28476.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 25 Feb. 1991.

Decided 10 Feb. 1993.

Appellate Counsel for the Appellant: Colonel Jeffrey R. Owens, Lieutenant Colonel Terry J. Woodhouse, Major George P. Clark, Captain Michael D. Burt, and Captain Robert I. Smith.

Appellate Counsel for the United States: Major Paul H. Blackwell, Jr., Major Jeffrey C. Lindquist, and Captain James B. Wager, Jr.

Before DIXON, O'HAIR, LEONARD, SNYDER, McLAUTHLIN, JAMES, GRUNICK, JOHNSON, and HEIMBURG, Appellate Military Judges, En Banc.

## OPINION OF THE COURT

SNYDER, Judge:

Pursuant to conditional pleas of guilty,[1] appellant was convicted by special court-martial of failure to obey a lawful order, and two specifications of escape from correctional custody.[2] He was sentenced to a bad-conduct discharge, 5 months confinement, and reduction to E–1. Appellant raises five assignments of error, of which only three merit extensive discussion. We grant partial relief on the findings and sentence.

Appellant now claims his pleas to the specifications and charge, Charge II, are improvident. The basis for his assertion is that comments in his unsworn statement during sentencing raised matter inconsistent with his plea. Specifically, he suggests the restraint he breached was moral, rather than physical.[3] Because of the salient facts of the instant case, for appellant's contention to prevail, we must accept the premise that a person placed in a designated, supervised correctional custody facility is not *thereby* under physical restraint. Indeed, appellant's supplemental brief argues as much. We disagree. Absent some evidence contradicting appellant's concession that he was under physical restraint in a centralized, monitored correctional custody facility, we decline to hold that his unsworn statement raising the possibility that the physical restraint was ineffective was a matter inconsistent with his pleas of guilty to escape from correctional custody.

Absent evidence demonstrating appellant was being controlled by moral restraint at the time of the offense, we find provident, his pleas that he escaped by casting off the restraint *of a monitored, centralized correctional custody facility*, regardless of the means by which he did so.

## I. FACTS

The following dialogue transpired between appellant and the military judge:

MJ: And are you, were there in fact limits on where you could go, within correctional custody, without the per-

---

1. R.C.M. 910(a)(2). We continue to remind staff judge advocates that, if the issue preserved by a conditional guilty plea is not *case dispositive*, it should not be accepted.

2. Articles 92 and 134, UCMJ (10 U.S.C. §§ 892, 934 (1988)).

3. As is usually the case, this issue would have been avoided with a more thorough providency inquiry, as well as a more comprehensive stipulation of fact.

mission of the correctional custody monitor?

Acc: Was there an outline, you mean,—

MJ: Yes.

Acc: —as far as I could go?

MJ: Um-hum.

Acc: I don't remember seeing anything like that.

MJ: No, but I mean—

Acc: No, I—

MJ: —did you understand that you were under physical restraint

Acc: —yes, sir.

MJ: —imposed by this correctional custody?

Acc: Yes, sir.

MJ: And that you would need the permission of the correctional custody monitor in order to go out of the correctional custody facility unless you were out on some kind of a work detail or something like that?

Acc: Yes, sir.

MJ: And you knew of the limits, the limitations placed on you with, in terms of physical restraint, by this,—

Acc: Yes, sir.

MJ: —by your status of being in correctional custody?

Acc: Yes, sir.

MJ: Okay. Now did you, on the 9th of February, free yourself from the physical restraint that had been imposed upon you?

Acc: Yes, sir.

MJ: What'd you do? Did you go downtown?

Acc: Went downtown, sir.

\* \* \* \* \* \*

MJ: Now, on the 13th of February, was your status still the same as it was on the 9th of February,—

Acc: Yes, it was.

MJ: —as being in correctional custody?

Acc: Yes, sir.

MJ: And again, you were aware of that status, is that correct?

Acc: Yes, sir.

\* \* \* \* \* \*

MJ: Okay. What did you do on the 13th of February to escape from correctional custody?

Acc: I needed to go use the phone, sir ... and I left through the back door.

MJ: And did you in fact surreptitiously leave the correctional custody facility without permission from anyone who could give you permission to leave?

Acc: Yes, sir

A stipulation of fact entered into by all parties at trial reflects the appellant left the correctional custody facility and went to a Las Vegas casino where he consumed beer. While there, he remarked to a noncommissioned officer working part-time at the casino that "I just snuck out of CC." Regarding the 13 February offense, the stipulation of fact reflects the appellant departed the facility "out the back door while the CC monitor was in his office."

## II. CORRECTIONAL CUSTODY

Appellant argues that finding physical restraint on the facts of the instant case renders paragraph 70, MCM, redundant. His argument refers to the second element of the offense, which requires the correctee to be under physical restraint while in correctional custody.[4] MCM, Part IV, paragraph 70(b)(1)(b) (1984). The essence of this argument is that the trial judge should have inquired into what extent, if any, the facility deterred or hampered appellant's freedom of movement. This argument fails to account for the essence of correctional custody.

Correctional custody is an authorized nonjudicial punishment pursuant to Article 15, UCMJ (10 U.S.C. § 815). The President defines correctional custody as "the physical restraint of a person during duty or nonduty hours, or both, imposed as a punishment under Article 15...." MCM, 1984, Part V, paragraph 5(c)(4) (1984). This definition is taken almost verbatim

---

4. Appellant completes his logical circle by concluding that, if so, then that element would require the instructions to state, "while in such correctional custody, the accused was in correctional custody."

from the Senate Report explaining the 1962 amendment to Article 15. Prior to defining correctional custody, the Senate Armed Services Committee stated as follows: "The bill contains a form of *physical restraint* not authorized in existing law, and termed 'correctional custody'." S.Rep. No. 1911, 87th Cong., 1st Sess. 7 (1962) (emphasis added).

Although there is a paucity of decisions involving correctional custody, the few in existence do not contradict the crystal clear intent of Congress and the President to make correctional custody a form of physical restraint, especially when the issue actually before the Court is separated from the collateral aspects. In *United States v. Carson*, 15 U.S.C.M.A. 407, 35 C.M.R. 379, 1965 WL 4684 (1965), attention might be diverted to the fact the correctee was locked in a barracks room. The issue before the Court, however, was whether the members had to find the correctional custody was legally imposed as an element of the offense of escape from correctional custody. The Court held that was a question of law and not an element of the offense for the factfinders. The decision placed no emphasis whatsoever on the fact the accused was actually locked up while undergoing correctional custody. In fact, the instructed elements required the members only to find the accused was *in* correctional custody and he freed himself from the restraint of that custody before proper release.

In *United States v. Mackie*, 16 U.S.C.M.A. 14, 36 C.M.R. 170, 1966 WL 4436 (1966), a case involving breach of correctional custody, appellate defense counsel argued to the Court that, because correctional custody and confinement differed only in semantics, correctional custody should be imposed only by sentence of court-martial. 36 C.M.R. at 174. The

Court disposed of the issue by emphasizing the correctee's right to demand trial by court-martial in lieu of Article 15 proceedings. There was no effort by the Court to articulate a position that correctional custody is not physical restraint.

This same issue was revisited during the United States Court of Military Appeals' decisions applying *Argersinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972), to UCMJ practice.[5] The argument was, because of the absence of a real distinction between correctional custody and confinement, Article 15 punishments which imposed correctional custody without representation by counsel should be inadmissible in a subsequent trial by court-martial as are summary courts-martial convictions which impose confinement without the accused being represented by counsel.[6] *See United States v. Shamel*, 22 U.S.C.M.A. 361, 47 C.M.R. 116, 1973 WL 14672 (1973). To Judge Quinn, correctional custody resembled restriction more than confinement, but only because of the differences in treatment accorded correctees *vis a vis* prisoners, not on the absence of physical restraint. His final comparison was to detention after school. 47 C.M.R. at 117. Although they differed on the disposition of the ultimate issue, the other two judges could not discern a substantive difference between correctional custody and confinement. *Shamel*, 47 C.M.R. at 118, 119 (Duncan, J., dissenting); *United States v. Alderman*, 22 U.S.C.M.A. 298, 46 C.M.R. 298, 308 at n. 1, 1973 WL 14505 (1973) (Darden, C.J., dissenting).

In short, there is nothing in those decisions to indicate correctional custody is not physical restraint.

Appellant's resort to comparisons with the offense of escape from confinement is persuasive, but in a manner contrary to his

---

5. *Argersinger* held that, even in misdemeanor actions, one cannot be sentenced to confinement, unless represented by counsel. This decision impacted the manner by which the armed forces administer trials by summary courts-martial. *See* Article 20, UCMJ (10 U.S.C. § 820 (1988)); R.C.M. 1301. Because Article 15 provides for correctional custody as an authorized punishment, the issue spilled over to Article 15 actions.

6. *Argersinger* impacts admissibility under R.C.M. 1001(b)(3) for aggravation purposes, and under R.C.M. 1003(d)(1) and (2) for sentence enhancement purposes. It does not impact admissibility for impeachment under Mil.R.Evid. 609.

position.[7] Appellant mistakenly interprets our decision in *United States v. Hodge,* 50 C.M.R. 445, 1975 WL 15647 (1975), to mean that more than a casting off of confinement status must be shown to constitute an escape, and, from that interpretation concludes the same holds for correctional custody. In fact, the part of *Hodge* appellant relies upon provides that evidence which shows the procedural requirements for confinement were accomplished is not proof, *per se,* that a person actually was placed in confinement. We held that, although Hodge had not been physically placed in the confinement facility, because the procedural steps were properly completed, and he was committed to the corrections supervisor who could not refuse to accept him, he was in confinement. Hodge's confinement *status* having attached, his flight from his guards *en route* to the facility constituted an escape from confinement, not an escape from custody. 50 C.M.R. at 448.

Any doubt in this regard should have been eliminated by our decision in *United States v. Cornell,* 19 M.J. 735 (A.F.C.M.R. 1984), which reemphasized our holding in *United States v. Maslanich,* 13 M.J. 611 (A.F.C.M.R.1982). Once confinement status attaches, the throwing off of that status by any means, whether by physically overpowering a guard, picking a lock, or by simply walking away, constitutes an escape. *See United States v. Felty,* 12 M.J. 438 (C.M.A.1982). In *Cornell,* we affirmed an escape from confinement where a minimum custody prisoner (who did not require an escort, etc.) left the installation without permission, rather than going to his stated destination.

■ The fact that correctional custody anticipates and mandates periods when the correctee is subject to moral restraint does not cancel the inherent status of physical restraint.[8] This factor is reflected in the Secretary of the Air Force's (SAF) implementation of the correctional custody provisions of Article 15. The Air Force concept states, in part, "[T]he deprivation of liberty is a severe punishment to be carefully considered and imposed only when it is necessary to closely hold the offender in a treatment setting." Air Force Regulation 125–35, *Correctional Custody,* para. 2 (4 September 1981). AFR 125–35 does not reflect any intent on the part of SAF to prosecute correctional custody offenses solely by charging breach of correctional custody, as the Secretary of the Army apparently has done. *See United States v. Kellner,* 16 M.J. 524 (A.C.M.R.1983). We note this is a policy decision by the Army which has no effect upon the essence of a correctee's status while in custody.

Comprehensive analysis of correctional custody reveals that moral restraint is present when the correctee is outside or beyond the designated, monitored correctional custody setting, e.g., when performing one's normal duties or when on unsupervised details, and when following designated routes to and from the correctional custody facility. When this standard is applied, the language of MCM, Part IV, para. 70(b)(1)(b) (1984) is not redundant.

■ Therefore, in the absence of evidence to the contrary, a correctee is under physical restraint whenever he or she has been committed to a designated correctional custody setting (a centralized base facility or designated area within a facility) under supervision of a monitor, and with knowledge he or she is not to leave except under specified circumstances.

---

**7.** Although correctional custody is physical restraint, it is not confinement. Consequently, the comparison of decisions on the two should be read in that light.

**8.** To help the factfinders focus on whether a correctee has actually committed a breach of correctional custody as opposed to an escape, the instruction on breach cautions as follows:

> Although a person in correctional custody is *always* under physical restraint, this offense involves the breach of other specific limitations upon a person's freedom of movement while under the *physical restraint* (emphasis added).
>
> Department of The Army Pamphlet 27–9, *Military Judges' Benchbook,* Change 1, para. 3–136 (18 February 1985).

## III. PROVIDENCY OF PLEAS

### A. Pleas to Escape From Correctional Custody

■ With these salient legal principles in mind, we now turn to appellant's pleas. Although appellant pleaded guilty, it is axiomatic that if he set up matters inconsistent with that plea *at trial,* or pleaded improvidently, his guilty pleas cannot stand. Article 45(a), UCMJ, 10 U.S.C. § 845(a). More than a possible ingenious conflict is required. There must be evidence of a substantial conflict with the accused's plea. *United States v. Logan,* 22 U.S.C.M.A. 349, 47 C.M.R. 1, 1973 WL 14641 (1973). However, we also must bear in mind appellant's pleas precluded the Government from putting on a more detailed case and developing the facts. *United States v. Burnette,* 35 M.J. 58 (C.M.A. 1992). Accordingly, for us to set aside appellant's pleas, the record must show a substantive basis in law and fact for questioning his guilty pleas. *United States v. Prater,* 32 M.J. 433 (1991). Further, an inconsistency is not generated by an absence of evidence from the record, but from the record's entirety. The same holds true for providency. Although additional evidence may be desirable, if the record in its entirety reflects appellant knew the elements of the offense to which he pleaded guilty and admitted them freely, even if the trial judge did not fully explain them, and there is a factual basis for his pleas, the pleas will stand. *United States v. Jones,* 34 M.J. 270 (C.M.A.1992).

The Stipulation of Fact reflects appellant was committed to Nellis AFB's Correctional Custody Facility. As indicated above, appellant admitted he knew he was under physical restraint by virtue of his status of being in correctional custody and that he could not leave the facility without permission. Nowhere in the record is there an indication the facility was viewed as moral restraint during evening hours. In fact, appellant avoided a monitor to depart on the second occasion. We may reasonably infer the monitor also was on duty during his first departure. During the providency inquiry into the second escape, the trial judge specifically referred appellant back to his responses on the first escape to ensure appellant was following him.

■ The MCM defines escape from correctional custody as:

The act of a person undergoing the punishment of correctional custody pursuant to Article 15, who, before being set at liberty by proper authority, casts off *any physical restraint imposed by the custodian or by the place or conditions of custody* (emphasis added).

MCM, Part IV, paragraph 70c(1) (1984). Appellant's responses to the trial judge clearly reflect acts which fall within that definition. His leaving without permission cast off a restraint imposed by the custodian, in the form of the monitor, as well as the place of his custody, the designated facility. It was not essential for the trial judge to ascertain *how* appellant cast off the physical restraint the facility and his status imposed upon him. Appellant's status while in the monitored facility transcended whether the back door was locked, or whether the facility even had locks and bars. Appellant knowingly and freely admitted to his status of physical restraint by being in correctional custody and escaping therefrom. His pleas were provident. *United States v. Burnette,* 35 M.J. 58 (C.M.A.1992); *United States v. Jones,* 34 M.J. 270 (C.M.A.1992); *United States v. Prater,* 32 M.J. 433 (C.M.A.1991).

■ We also find appellant's pleas were consistent throughout the entire trial. During appellant's unsworn statement, defense counsel asked, "how'd you actually get out?" Appellant responded, "there's no security in that place whatsoever. It's just, I went out through the back door." We do not view this remark as matter inconsistent with an admission of escape, but mere rationalization by appellant to justify his behavior.[9] *United States v. Pe-*

---

**9.** Unlike our dissenting brethren, we do not believe it necessary to look beyond appellant's pleas to ascertain "how much" physical restraint was imposed upon him while in the facility. Appellant's quip while at the casino reflects his

**910**

*nister,* 25 M.J. 148 (C.M.A.1987). To state, in essence, had he been chained to his bed, or locked in his room, he would not have left, is to state the obvious. The absence of security devices does not convert appellant's restraint to moral restraint. Neither does his rationalization render his comment substantively inconsistent with his plea. *Penister,* 25 M.J. at 153 (Cox, J., concurring).

### B. Plea to Failure To Obey An Order

As a result of appellant taking the pleasure of a beer during his first sojourn from correctional custody, he was charged with failure to obey a lawful order. The act was alleged as a violation of Correctional Custody Operating Instruction 39–6, para. 2e. Its specific title is, "Correctee Honor System."

■■■ We find this "order" to be so broad and vague that it amounts to no order at all. Although the Instruction cautions the reader that, "Violations of the honor system ... may be cause for disciplinary action," it falls short of being sufficiently clear and definite to place one on notice of the prohibited conduct. *See generally United States v. Benway,* 19 U.S.C.M.A. 345, 41 C.M.R. 345, 1970 WL 7347 (1970); *United States v. Baker,* 18 U.S.C.M.A. 504, 40 C.M.R. 216, 1969 WL 6046 (1969); *United States v. Hogsett,* 8 U.S.C.M.A. 681, 25 C.M.R. 185, 1958 WL 3110 (1958). For example, the provision supposedly forbidding the consumption of alcohol is under the heading of: "The following will not be condoned: ... consumption of alcohol." Also not to be condoned are: quibbling and evasiveness, profanity (not defined), attitudes (non-specified), altercations, infringements upon privacy, and the refusal to render assistance to those in need. On balance, the Instruction reads more like a civics lesson than a military order. Consequently, the Instruction, as a whole, fails to state a military order enforceable under Article 92, UCMJ, 10 USC § 892. *United States v. Scott,* 22 U.S.C.M.A. 25, 46 C.M.R. 25, 1972 WL 14384 (1972).

knowledge he had to bypass more than his personal moral recognizance to leave the facility.

■■■ There remains the issue of our possibly approving a finding of the lesser offense of dereliction of duty. Where a providency inquiry fully apprises an accused of the elements of an included offense as part of the elements of the charged offense, and an accused's responses knowingly and clearly admits the included offense, we may approve an included offense on appeal. *See United States v. Sassaman,* 32 M.J. 687 (A.F.C.M.R.1991); *Cf. United States v. Brown,* 18 M.J. 360 (C.M.A.1984).

During his providency inquiry, appellant admitted he had a duty to obey the Correctional Custody Instruction, and he knowingly consumed alcohol contrary to the Instruction. On their face, these admissions appear to constitute the offense of dereliction of duty.[10] The Instruction's inherent deficiencies, however, constrain us to decline to approve a conviction of the lesser offense of dereliction of duty, appellant's admissions, notwithstanding.

In addition to the Instruction's broad hortatory provisions noted above, the Instruction essentially incorporates all the UCMJ's punitive articles (Articles 77 through 134, 10 USC §§ 877 through 934) under items which are not condoned. Obviously, this Instruction is not needed to prevent thefts or assaults, for Articles 121 and 128, 10 USC §§ 921 and 928 prohibit such misconduct. This Instruction, in essence, merely encourages Nellis AFB Correctional Custody correctees to be good citizens and obey the law, a duty to which they are subject at all times without the help of the Instruction. Therefore, we disapprove entirely the findings on Charge I and its specification.

### IV. IMPROPER POST–TRIAL PROCESSING

The final assignment of error we discuss in detail is the improper preparation of the Staff Judge Advocate's Recommendations to the convening authority (SJA Recommendations) by the assistant trial counsel, Major D. This was contrary to Article 6(c),

10. *See* Article 92(3), UCMJ (10 U.S.C. § 892(3) (1988).

10 USC § 806(c) and R.C.M. 1106(b). Under the circumstances of the instant case, we find this statutory violation to have been waived, and we find no plain error.

■ The allied papers of the record of trial reflect the SJA Recommendations were duly served on trial defense counsel as required. R.C.M. 1106(f). In the post-trial submissions, trial defense counsel did not assert the existence of any errors in the SJA Recommendations. He limited his submissions to a clemency request on behalf of appellant. Failure to specifically note patent errors in the SJA Recommendations constitutes a waiver of those errors. R.C.M. 1106(f)(6). R.C.M. 1106(f)(6) does not exempt any particular errors from its waiver provision.

Although the post-trial processing with which we are involved is deemed part of an accused's military due process rights, such rights are not immune to waiver. We previously have held that constitutional rights may be waived just as statutory rights and other benefits. *United States v. Lucas,* 19 M.J. 773 (A.F.C.M.R.1984), *aff'd,* 25 M.J. 9 (C.M.A.1987), *cert. denied,* 484 U.S. 1027, 108 S.Ct. 752, 98 L.Ed.2d 764 (1988) (failure to object at trial to improper use of immunized testimony held waived on appeal).

■ Having deemed the error waived, we test for plain error and find none. First, Major D's handiwork did not go directly to the convening authority. The staff judge advocate also signed the SJA Recommendations and certified he had reviewed the record of trial and recommendation, and concurred. *See United States v. Grinder,* 28 M.J. 840, 843 (A.F.C.M.R. 1989). Second, the SJA personally prepared and signed the Addendum to the SJA Recommendations, which was the response to trial defense counsel's R.C.M. 1106(f) response. Thus, we conclude the interests of justice do not require a new SJA Recommendation and convening authority action.

It begs the issue to state these type errors are very easily avoided. No one should be more aware of a statutory disqualification than the disqualified person him or herself. In the instant case, Major D should have been aware of and voiced his disqualification when asked to prepare the SJA Recommendations. Failure to detect and avoid such rudimentary errors contributes to the many instances of the Courts of Military Review having to remand otherwise valid convictions.

## V. REMAINING ASSIGNMENTS OF ERROR

We have considered the other assignments of error and resolved them adversely to appellant. *McNeil v. Wisconsin,* — U.S. —, 111 S.Ct. 2204, 115 L.Ed.2d 158 (1991); *United States v. Lewis,* 33 M.J. 758 (A.C.M.R.1991); R.C.M. 1001(a)(1)(A); Mil. R.Evid. 103(a)(1); *United States v. Martin,* 36 M.J. 739 (A.F.C.M.R.1993).

## VI. CORRECTIVE ACTION

■ In view of Part IV–B, *ante,* we must determine whether remand for a rehearing on sentence only, or sentence reassessment is appropriate. Our review of the record convinces us that we can reassess the sentence to reflect what sentence appellant would have received had he not been charged with the failure to obey a lawful order not to consume alcohol. *United States v. Peoples,* 29 M.J. 426 (C.M.A.1990). We believe the members viewed the two escapes from correctional custody as the gravamen of appellant's misconduct. Reassessing on that basis, we find appropriate only so much of the sentence as provides for a bad-conduct discharge, 4 months confinement, and reduction to E–1.

## VII. DECRETAL

The findings on Charge I and its specification are disapproved, and Charge I and its specification are dismissed. The findings and sentence, as modified, are correct in law and fact, Article 66(c), 10 USC § 866(c), UCMJ, and are hereby,

AFFIRMED.

Chief Judge DIXON, Senior Judges O'HAIR and McLAUTHLIN, and Judges GRUNICK and HEIMBURG concur.

HEIMBURG, Judge (concurring):

I concur in the opinion of Judge Snyder, and write separately only because I believe it necessary to mark out more clearly the boundary between the majority and the dissent concerning Charge II.

The opinions in this case have revealed significant differences of opinion on the nature of "physical restraint" in correctional custody. Without minimizing these differences, it is important to note that the Court's decision does not require adoption of one of the conflicting views. The Court does not today decide whether correctional custody automatically includes physical restraint or authorizes physical restraint to be imposed by competent authority. Nor does it define what physical restraint may be required if not automatically included—whether it requires some physical means of restricting the correctee's movements or may be assumed to exist when proper limits are defined in a designated building or other facility. Most importantly, this case does not decide that the *status* of being in correctional custody equates to the *fact* of being under physical restraint.

The issue we addressed was whether a guilty plea was provident. What most divides the majority and minority on that issue are the assumptions each brings to a review of the providency of a guilty plea to escape from correctional custody. One of the "assumptions" of which I speak concerns the meaning of the term "correctional custody." Each of us carries mental images which color and give meaning to the words we *see* when we read a record of trial. If appellant had been confined rather than in correctional custody, his offhand or flippant remarks to the court, "there's no security in that place whatsoever.... I went out through the back door" would not have been viewed as contradicting his plea of guilty. It is because judges know of Air Force correctional custody facilities which *have* "no security ... whatsoever" that these words immediately raise questions: What kind of facility was he talking about? Was there any real security? Having such questions does not equate to "matters inconsistent" with a guilty plea. Unless

something an accused says raises a defense or undercuts an element of the offense, we should not consider the plea improvident just because we would like to know more facts which, were the case litigated, would be necessary to proof. *United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1, 1973 WL 14641 (1973); *United States v. Burnette*, 35 M.J. 58 (C.M.A.1992); *United States v. Prater*, 32 M.J. 433 (C.M.A.1991). Otherwise, we will be in danger of nullifying the stern warning each trial judge gives a person about to plead guilty:

> A plea of guilty is equivalent to a conviction and is the strongest form of proof known to the law. On the basis of your plea alone, and without receiving any evidence, this court could find you guilty of the offense(s) to which you plead guilty.

Department of the Army Pamphlet 27–9, para. 2–9. *See also*, Article 45, U.C.M.J., 10 U.S.C. § 845.

An objective look at what appellant told the court about the escape charge shows the providency of his pleas. He first acknowledged that he understood the elements, including the element that, "while in correctional custody, you were under physical restraint." Appellant told the court there was a "monitor" in the correctional custody facility whose permission he needed to leave. The presence of a monitor who has the duty and means to prevent departure can equate to physical restraint, for the monitor equates to the "custodian." Manual for Courts–Martial, 1984, Part IV, para. 70c(1). Appellant told the military judge he left the correctional custody facility on both occasions without obtaining permission to do so: the first time he "snuck out" and the second time he "left through the back door" while the monitor was otherwise occupied.

At that point, appellant had given the court sufficient information to support his guilty pleas, but my dissenting brothers find inconsistency in subsequent statements he made during his unsworn statement. Let's examine them, also. In a colloquy with his defense counsel, appellant was explaining his actions in escaping from

correctional custody. Concerning the first incident, appellant explained that it was "bad, being in there" all alone, and he was bored, he "needed just to, to explode." How did he get out? "—[T]here's no, there's no security in that place whatsoever. It's just, I went out through the back door." He came back several hours later, and "nobody knew anything about it." This is the same incident in which, according to the stipulation of fact appellant agreed to, appellant told a NCO he saw at a casino downtown, "between me and you I just snuck out of CC."

Apart from one's assumptions regarding what sort of correctional custody facility this must have been, appellant's comments during his unsworn statement raised no inconsistency whatever with his guilty plea. Sneaking away from a guard, custodian, or "monitor" is not inconsistent with the presence of physical restraint; indeed, were there no physical restraint sneaking would be unnecessary.

Another assumption that divides this Court is the weight to give to an accused person's assent to the terms used by the military judge to explain the elements of the offense. I am prepared to assume that appellant understood the term "physical restraint;" this term is not a legal term of art requiring advanced education to understand. Thus, despite the conclusory nature of the military judge's inquiry, it established a factual basis for appellant's plea. *See*, R.C.M. 910(e); *United States v. Care*, 18 U.S.C.M.A. 535, 40 C.M.R. 247, 1969 WL 6059 (1969).

By his pleas, agreement to a stipulation of fact, and response to questions by the military judge, appellant gave this Court an adequate basis for upholding his conviction of escape from correctional custody. We should not require proof of facts in a guilty plea case when no factual dispute exists. Believing appellant's pleas to Charge II provident, I join the majority in upholding his conviction and sentence.

Judge JAMES, with whom Senior Judge LEONARD and Judge JOHNSON join (concurring in part and dissenting in part):

We dissent from the majority's disposition of the conviction for escape from correctional custody.[11]

11. This case was originally decided by panel 3 of this Court, consisting of Senior Judge Leonard, Judge Johnson, and me. The panel voted and agreed on an opinion that set aside all the findings of guilty. During "off panel" circulation, an "off panel" judge suggested *en banc* consideration. The majority of the Court agreed, and the Court *en banc* then formed a majority for the current disposition.

There was a time when a panel's decision in an individual case could not legally be overturned by the Court sitting *en banc*. *United States v. Chilcote*, 20 U.S.C.M.A. 283, 43 C.M.R. 123, 1971 WL 12735 (1971); *see, e.g., Coleman v. United States*, 21 U.S.C.M.A. 171, 44 C.M.R. 225, 1972 WL 14081 (1971); *Maze v. Army Court of Military Review*, 20 U.S.C.M.A. 599, 44 C.M.R. 29, 1971 WL 12438 (1971); *United States v. Wheeler*, 20 U.S.C.M.A. 595, 44 C.M.R. 25, 1971 WL 12437 (1971). This result, based on statutory construction, was changed by the Military Justice Act of 1983, 97 Stat. 1393, 1402, which amended Article 66(a) to provide for *en banc* reconsideration of any panel decision in accordance with the Court's rules. S.Rep. No. 53, 98th Cong. 1st Sess. 28 (1983), as quoted at *United States v. Flowers*, 26 M.J. 463, 465 (C.M.A.1988) (q.v.).

Rule 17 of the Courts of Military Review Rules of Practice and Procedure, 22 M.J. CXXVII, CXXXIII, provides that such reconsideration "ordinarily will not be ordered except (1) when consideration by the full Court is necessary to secure or maintain uniformity of decision, or (2) when the proceedings involve a question of exceptional importance, or (3) when a sentence being reviewed ... extends to death." There was no conflict among decisions of different panels on any issue in this case, and the punishment obviously does not extend to death.

One might question whether such a subjective standard as "exceptional importance" is so devoid of discernible criteria as really to constitute *no* rule. Were that the case, such a judicial mugging as this one would be in violation of the statute's "in accordance with rules" clause. Presumably the *Chilcote* result would follow necessarily.

The decision of the majority to reconsider this case *en banc* can be justified only on the basis that this is a case of exceptional importance, and it demonstrates that the standard in the rules is interpreted by this Court as broad enough to cover any situation where the majority disagrees with a panel's decision. The question of how to properly charge offenses against correctional custody meets no plausible standard of "exceptional importance." Surely this excursion into a seldom visited back alley of military justice is not what the Congress and the Judge Advocates General had in mind when they gave us permission to shoot our toes off.

The Court divides on the requirement for "physical restraint" to sustain a conviction for escape from correctional custody. The majority's lexicographical highjinks assume away an element of proof. The majority is willing to infer the presence of physical restraint simply from the·status of custody. Its theory for its disposition avoids any analysis of the extent to which there were replies given by Airman Felix during the "providency inquiry" that were inconsistent with his concession that he was under "physical restraint." The majority lives in an Aristotelian world of pure, symbolic logic in which it assumes a state of the legal universe without bothering to look out the window to see whether its belief has any real connection with reality.

Now it is, regrettably, our job to throw bricks through its windows. To establish our view, we first review the requirement that a military judge inquire into matters inconsistent with a plea of guilty, for that is the legal turning point in this case. Next we note the diversity in the use of correctional custody, for it accounts for much of the dispute. Then we look at the elements of the offense to highlight the pivotal difference between infractions against moral restraint and infractions against physical restraint. Finally, we review very briefly the law relating to escapes from confinement, for it explains how the majority could possibly come to such a result.

## I. MATTERS INCONSISTENT WITH PLEA OF GUILTY

Whenever a plea of guilty is offered, the military judge must "inform the accused of ... the nature of the offense." R.C.M. 910(c)(1). The elements of that offense should be described. *Id.*, Discussion. The military judge must then determine the accuracy of the plea by inquiring into the underlying facts. R.C.M. 910(e). When the accused makes statements inconsistent

with the offered plea of guilty, the military judge must resolve the inconsistency or enter a plea of not guilty for the accused. Article 45(a), UCMJ, 10 U.S.C. § 845(a) (1988); R.C.M. 910(h)(2); *see generally United States v. Logan*, 22 U.S.C.M.A. 349, 47 C.M.R. 1, 1973 WL 14641 (1973). *Logan* corrects the mistaken view in some prior decisions that a "mere possibility" of inconsistency required that the plea be rejected and substitutes the "substantial conflict" test which now prevails. *See, e.g., United States v. Prater*, 32 M.J. 433 (C.M.A.1991). Nonetheless, we emphasize that the "inconsistency" rule is statutory, not something cooked up in the wild imagination of soft-hearted appellate judges. It deserves to be applied as it was intended to be applied, not subverted. Momentarily we conclude that such a substantial conflict occurred in this case, but first we address the nature of offenses against correctional custody so that the occurrence of the conflict can be understood in its context.

## II. WHAT DOES CORRECTIONAL CUSTODY LOOK LIKE?

The central disagreement in this case arises because the majority views correctional custody as necessarily including physical restraint. Just as the majority says, correctional custody is defined by the President as "physical restraint of a person." Manual For Courts–Martial, United States, 1984 (MCM), Part V, paragraph 5c(4). The majority stops there—thus it is defined and thus it must have been—and lets its dictionary of common military justice terms govern reality. Conversely, we take notice that the implementing practices vary.

Thus, Judge Quinn once remarked, "As I assess correctional custody it resembles restriction so much more than confinement that it ... does not ... fall within *Argersinger's*[12] prescription of the right to appointed counsel." *United States v. Sha-*

The Court of Military Appeals indicated in *Flowers* that it was concerned with proper compliance by the Courts of Military Review with Rule 17. The extent to which such concern may be the basis for relief to an appellant remains an open question.

12. *Argesinger v. Hamlin*, 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972) (right to counsel when confinement results).

*mel,* 22 U.S.C.M.A. 361, 362, 47 C.M.R. 116, 117, 1973 WL 14672 (1973). He compared it "to the practice of 'detention' after school." *Id.*

In the 1960s our Army brethren imposed correctional custody on a particularly slippery soldier:

*Various moderate restraints* of the accused's freedom of movement were ineffectual and, eventually, he was placed in a locked room on the third floor of the company barracks. He escaped.

*United States v. Carson,* 15 U.S.C.M.A. 407, 35 C.M.R. 379, 380, 1965 WL 4684 (1965) (emphasis added). What is notable is not that the miscreant was eventually locked up in correctional custody but is instead that he was not locked up until less severe restraints failed successively. More recently, at least, the Army's regulation "mandate[d] the use of moral, rather than physical, restraint in correctional custody facilities." *United States v. Kellner,* 16 M.J. 524, 525 (A.C.M.R.1983). *Cf. United States v. Shamel,* 22 U.S.C.M.A. 361, 47 C.M.R. 116, 1973 WL 14672 (1973).

The Air Force implementing regulation does not state the required circumstances of correctional custody, but it provides, "Normal troop housing may be adapted to correctional custody use by physically defining an area for such custody." Air Force Regulation 125–35, *Correctional Custody,* paragraph 4a (4 September 1981). Of course, the physical definition could be a line painted on the floor. The same provision also contemplates use of jails, but we take notice that there are Air Force correctional custody programs which do not feature the jail-like setting that the Manual's definition implies.

An earlier example of such an Air Force facility was described in *United States v. Blosser,* 35 C.M.R. 902, 1965 WL 4762 (A.F.B.R.1965):

When accused was first placed in the ... correctional custody facility he was informed by the NCOIC thereof he must not leave the building without permission, and whenever he did leave he was to "sign out" in the logbook on the first sergeant's desk, and when he returned he was to "sign in." He received and acknowledged reading and understanding a copy of the "Correctional Custody Rules & Regulations" which, among other things, purported to require him to sign out or in whenever he departed or entered the building (confinement facility) and to prohibit his consumption of alcoholic beverages.

*Id.* at 906. Blosser left the facility *with permission* to serve as a firewatch and failed to return. Instead, like Airman Felix, he went into town to drink. Blosser was correctly charged with and convicted of breach, not escape. Though his departure is different from that of Airman Felix, we do not know how the majority would avoid calling the *Blosser* episode an escape, relying as it does on literal application of the President's definition, and yet it is clear that no physical impediment governed Blosser's movements after he left the facility.

In such facilities, the offender may still be obliged to stay unless permitted to leave, but the obligation is imposed by an order, and it is a moral obligation, not a physical restraint. *See, e.g., Kellner,* 16 M.J. at 525.[13] *Physical* restraint is required to constitute escape, as we see below.

## III. ELEMENTS

The Manual describes two approaches to pleading the offense involved in unauthorized flight from correctional custody.[14] One not acquainted with variations in the conditions of correctional custody might overlook the distinction between physical and moral restraint and select the wrong

13. Neither stone walls nor iron bars are required to make a correctional custody facility, though they are not inconsistent with the idea. However, their functional equivalents are required to make an escape possible. *Cf. United States v. Ellsey,* 16 U.S.C.M.A. 455, 37 C.M.R. 75, 79, 1966 WL 4610 (1966) (prisoner ordered into confinement escaped from escort while in route to facility did not escape from confinement but breached custody).

14. *See generally United States v. Riedel,* 37 C.M.R. 801, 1966 WL 4659 (A.F.B.R.1966).

approach. One is *escape* from physical restraint, appropriate for instances like that in *Carson,* and the other is *breach* of any other form of restraint, e.g., the moral duty to remain in custody unless released.[15] MCM, Part IV, paragraph 70b, c (1984).

Breach and escape are different. Each includes as an element of proof the nature of the restraint imposed and violated. *Id.* The maximum confinement which may be adjudged for an escape is *double* that which may be imposed for a breach. *Id.* at 70e. Perhaps for that reason the elements of proof of an escape require the prosecution to prove that "while in such correctional custody, the accused was under *physical* restraint" and that "the accused freed himself ... from the *physical* restraint." *Id.* at 70b(1)(b)-(c) (emphasis added). In contrast, the elements of a breach are satisfied simply by proof of "a certain restraint." *Id.* at 70b(2)(b). We are happy that we are not obliged to account for the mysterious presence of the breach specification if, as the majority contends, one who is put into the status of correctional custody is necessarily, *ipso facto,* thereafter under physical restraint. There is no explanation. If one follows the majority's definitional logic, correctional custody always entails physical restraint, and the breach specification has no use.

We would have thought that the Manual's statement of the elements would have been enough to dispose of this case: Some proof is required that there was *physical* restraint, and, in a guilty plea case, some inquiry is required when the accused gives replies inconsistent with the existence of physical restraint. Moral suasion is not enough to prove an escape, though it is satisfactory for proof of a breach.

Given the diversity in implementing correctional custody, the President's definition (correctional custody is physical restraint) does not substitute for facts. After all, it is perfectly possible that his subordinates deviated from his expectations when they implemented the authority to impose correctional custody. That is not in the least a surprise, for one must be careful about confining citizens without trials. While the constitutional and military due process aspects were touched in *United States v. Mackie,* 16 U.S.C.M.A. 14, 36 C.M.R. 170, 1966 WL 4436 (1966), and *United States v. Shamel,* 22 U.S.C.M.A. 361, 47 C.M.R. 116, 1973 WL 14672 (1973), there is always the threat of legislative responses if correctional custody is too often too strenuous. Thus, it is easily understood and perhaps commendable that the President's subordinates have not uniformly instituted correctional custody with all the rigor that he seems to have believed lawful. With Congress ever watchful, sometimes authority lawfully had is best not exercised to its limits, lest perceptions of abuse result in the authority being taken away.

Despite our discussion of what we believe to be a differing perception of the world of correctional custody, the majority assumes that physical restraint follows in proof by logical tautology. In contrast, we would hold that assumptions are not good enough to satisfy an element of proof that doubles the maximum punishment. Not all correctional custody necessarily involves physical restraint, regardless of the Manual's definition. Where the offender is not shown to have been behind locked doors or similar physical restraint, as is sometimes the case in Air Force facilities, there may still be an offense committed when the offender leaves the facility, but the offense is breach, not escape.

## IV. THE ESCAPE PRECEDENTS

One must ask how the majority—reasonable judges all—could possibly get this so wrong as we in the minority contend. We should avoid speculation about the majority's thought process, but in this case it has been fairly overt. The majority analogizes from some of the cases involving escapes from confinement under Article 95, UCMJ, 10 U.S.C. § 895 (1988). We think that is unwise, for those cases are treacherous, too, badly in need of careful reconsidera-

---

15. *See, e.g., Mackie,* 36 C.M.R. at 171-72; *United States v. Blosser,* 35 C.M.R. 902, 906, 1965 WL 4762 (A.F.B.R.1965); *United States v. Baker,* 35 C.M.R. 916, 1965 WL 4765 (A.F.B.R.1965).

tion. When the touchstone for an analogy is faulty, one should do without.

There is an oft-repeated doctrine that a prisoner remains in "physical restraint" even when outside the jail if accompanied by an escort who—even unarmed—has the means and duty to oppose flight. *See, e.g., United States v. Hodge*, 50 C.M.R. 445, 1975 WL 15647 (A.F.C.M.R.1975). We have no fight to pick with the general idea that an escort can supply the physical restraint that is otherwise lacking outside a jailhouse, but, as one might expect, prior cases have offered many an opportunity to find the limits of that doctrine. For example, in *United States v. Cornell*, 19 M.J. 735 (A.F.C.M.R.1984), our predecessors affirmed a conviction of escape from confinement where the prisoner—in minimum custody—was permitted to go out of the jail unescorted to a gym, from whence he fled without authority. *Cornell* was based on *United States v. Maslanich*, 13 M.J. 611 (A.F.C.M.R.1982), *pet. denied*, 14 M.J. 236 (C.M.A.1982), in which a panel of this Court explicitly overruled with only momentary analysis the precedent inconsistent with its view of the law relative to "physical restraint."

One might well criticize *Cornell* and *Maslanich* as confusing the *status* of confinement with the *fact* of physical restraint, both of which appear to be required in an escape from confinement. That is exactly the flaw in the majority's approach in this case, explicitly stated in its opening. As the clarity of the distinction between the two has been reduced, we seem in *Cornell* to have gotten to the point that proof of one element (physical restraint) may be inferred from proof of the other (status of confinement), regardless whether the facts of the prisoner's life were congruent with that inference. To put it even more bluntly, *Cornell* and *Maslanich* lure one seductively into *assuming away* a distinct requirement for proof of "physical restraint." Such a flawed approach warrants reconsideration.

Regrettably, neither *Cornell* nor *Maslanich* make a persuasive brief for such a position.[16] Lacking sound arguments, we

---

16. *Maslanich* joined the assessment of some sister-service decisions that the precedents are not consistent. 13 M.J. at 613 n. 1, 614 n. 3. It is certainly true that the prior decisions offered an interesting variety of outcomes, but it seems something of an exaggeration to view them as too hopelessly splintered ever to be reconciled. *See generally United States v. Hodge*, 50 C.M.R. 445, 1975 WL 15647 (A.F.C.M.R.1975) (physical restraint outside the facility depends on a guard who has the "means and the duty ... to oppose" escape); *United States v. Seelke*, 45 C.M.R. 631, 1972 WL 14265 (A.C.M.R.1972), *pet. denied*, 21 U.S.C.M.A. 648, 45 C.M.R. 929 (1972) (record silent about instructions to unarmed escort, instructions to call "halt" are not enough); *United States v. Dees*, 45 C.M.R. 891, 1972 WL 14312 (N.C.M.R.1972) (proof of physical restraint adequate where guard had a duty to oppose escape, but left prisoners unsupervised momentarily); *United States v. Roberts*, 43 C.M.R. 998, 1971 WL 12920 (A.F.C.M.R.1971) (plea to escape not improvident where prisoner on work detail hopped off truck); *United States v. Hahn*, 42 C.M.R. 623, 1970 WL 7182 (A.C.M.R.1970) (no escape where no evidence that guard has means or duty to do more than cry "halt"); *United States v. Hamilton*, 41 C.M.R. 724, 1970 WL 7385 (A.C.M.R.1970) (mere requirement that a guard cry "halt" does not constitute physical restraint); *United States v. Faist*, 41 C.M.R. 720, 1970 WL 7383 (A.C.M.R.1970) (escape set aside where parolee on work detail given permission to go unsupervised to a latrine, then left); *United States v. Connor*, 40 C.M.R. 614, 1969 WL 6155 (A.C.M.R.1969) (physical restraint adequately shown where prisoner jumped out a window while momentarily out of sight of a guard who had orders to shoot); *United States v. Laurie*, 37 C.M.R. 663, 1967 WL 4317 (A.B.R. 1967) (guilty plea to escape set aside where prisoner was released without supervision for detail); *United States v. Silk*, 37 C.M.R. 523, 1966 WL 4631 (A.B.R.1966) (physical restraint continues outside prison if guard has means and duty: no restraint where prisoners at work in dining hall could not all be watched at once); *United States v. Sines*, 34 C.M.R. 716, 1964 WL 5104 (N.B.R.1964), *pet. denied*, 14 U.S.C.M.A. 697, —— C.M.R. —— (1964) (unarmed guard with instructions to refrain from chasing was not "physical restraint"); *United States v. Morrison*, 33 C.M.R. 899, 1963 WL 4966 (A.F.B.R. 1963), *pet. denied*, 14 U.S.C.M.A. 681, 33 C.M.R. 436 (1963) (escape affirmed where guard had means and duty; ineffectiveness immaterial); *United States v. Ramsey*, 33 C.M.R. 566, 1963 WL 4916 (A.B.R.1963) (no escape where minimum custody prisoner walks away with permission of KP supervisor but does not return, supervisor has no duty to do more than "try to talk him out of it" and trail); *United States v. Morgan*, 32 C.M.R. 665, 1963 WL 4596 (A.B.R. 1963) (escape affirmed where prisoner under loose supervision of cook went outside to clean grease racks, then left unimpeded, because

cook had means and duty, even though ineffective); *United States v. Vincent,* 24 C.M.R. 506, 1957 WL 4838 (N.M.B.R.1957) (escape affirmed, physical restraint continued where prisoners taken outside prison were left unsupervised in a lounge first for 30 minutes, then a few more); *United States v. Block,* 18 C.M.R. 458, 1955 WL 3352 (C.G.B.R.1955) (escape affirmed, physical restraint found where prisoners detailed to boiler room of brig were not always in sight of unarmed supervisor who had means and duty, because relaxed vigilance was still enough given that the site was on a base); *United States v. Hunker,* 18 C.M.R. 703, 1955 WL 3358 (A.F.B.R.1954) (custody & confinement distinguished: where commander ordered accused into confinement, accused escaped while en route, held to be an escape from confinement!); *United States v. Stewart,* 17 C.M.R. 805, 1954 WL 2710 (A.F.B.R.1954) (escape affirmed, physical restraint found where unarmed guard escorted prisoners to chapel, left them outside to look in, whereupon they ran away) (some physical restraint is required, but how much is immaterial); *United States v. English,* 17 C.M.R. 693, 1954 WL 2691 (A.F.B.R.1954) (escape affirmed, physical restraint found where unarmed escort believed he was responsible for prisoners, searched immediately; *Holcomb* distinguished); *United States v. Holcomb,* 16 C.M.R. 537, 1954 WL 2519 (A.F.B.R.1954) (no escape, no physical restraint where unarmed escort had been ordered not to touch prisoners, only to call halt: "Moral restraint will not suffice...." at 541); *United States v. Wolfrey,* 15 C.M.R. 768, 1954 WL 2394 (A.F.B.R.1954) (escape affirmed where prisoner on detail was left behind when supervisor drove away, but record does not show how far, etc.) (B.R. deferred to trial court's view of the evidence); *United States v. Freeman,* 15 C.M.R. 639, 1954 WL 2374 (A.F.B.R.1954), *pet. denied,* 4 U.S.C.M.A. 734, 16 C.M.R. 292 (1954) (escape affirmed where escorted prisoner was allowed to go unescorted to water fountain, then left: momentary laxity of the guard is a matter of ineffectiveness); *United States v. Lorey,* 14 C.M.R. 393, 1954 WL 2153 (A.B.R.1954) (escape affirmed, physical restraint found where guard armed with shotgun went to sleep: inattentiveness was a matter of ineffectiveness); *United States v. Travis,* 13 C.M.R. 780, 1953 WL 2560 (A.F.B.R.1953) (escape set aside where prisoner given permission to go unsupervised to a latrine then kept going); *United States v. Haddox,* 12 C.M.R. 675, 1953 WL 2332 (A.F.B.R.1953), *pet. denied,* 3 U.S.C.M.A. 838, 13 C.M.R. 142 (1953) (escape affirmed where prisoner was under armed guard but escort was distracted by conversation with hostess); *United States v. Fritts,* 12 C.M.R. 232, 1953 WL 2228 (A.B.R.1953), *pet. denied,* 3 U.S.C.M.A. 835, 12 C.M.R. 204 (1953) (no fatal variance where accused charged with escape from custody, but evidence showed escape from confinement: accused had been apprehended, then confined, and proof of the confinement included proof of the custody); *United*

*States v. Wesson,* 9 C.M.R. 839, 1953 WL 2755 (A.F.B.R.1953) (no escape where prisoner was left unsupervised to wash car, stole it and drove away: last of the physical restraint abated when car wash supervisor went away for rags); *United States v. Farley,* 9 C.M.R. 753, 1953 WL 2737 (A.F.B.R.1953) (escape set aside where escorted prisoner was told to go alone to x-ray room because escort had too many prisoners, prisoner was then under no physical restraint when he left x-ray room); *United States v. Conner,* 7 C.M.R. 477, 481–82, 482 n. 1, 1952 WL 2556 (A.F.B.R.1952) (how restraint continues even where lax so long as not permitted freedom by one with authority); *United States v. Garner,* 7 C.M.R. 446, 1953 WL 1577 (N.B.R.1952) (guilty plea to escape from confinement provident where accused left when working outside supervision of escort outside jail); *United States v. Urquhart,* 6 C.M.R. 445, 1952 WL 2394 (A.B.R.1952) (no physical restraint, therefore no escape where parolee left jail on "trusty pass," went on errand, then fled: only moral restraint involved); *United States v. Wildman,* 6 C.M.R. 406, 1952 WL 2383 (A.B.R.1952) (escape from *confinement* affirmed where prisoner escaped from armed escort en route to jail after approval of adjudged confinement) ("at most an immaterial variance" anyway); *United States v. Fabrizzio,* 6 C.M.R. 623, 1952 WL 2438 (A.F.B.R.1952) (no restraint and no escape where minimum security prisoner signed out, left with permission but without return); *United States v. Owens,* 6 C.M.R. 515, 1952 WL 2413 (A.F.B.R. 1952) (minimum custody prisoner left place of work where he was unsupervised: no "physical restraint"); *United States v. Sanches,* 2 C.M.R. 278, 1951 WL 2240 (A.B.R.1951) (physical restraint continued where prisoner on detail outside jail was under guard's supervision); *United States v. Trimble,* 2 C.M.R. 718, 1951 WL 2294 (A.F.B.R. 1951) (cannot "suffer escape" when the prisoner has been permitted—even without authority—to go about without guard); *United States v. Noell,* 79 B.R. 117 (1948) (no restraint and no escape where parolee allowed to sign out from jail to duty did so, did not return: moral suasion not equivalent to physical restraint); *United States v. Van Breeman,* 8 B.R. (E.T.O.) 405 (A.B.R.1944) (escape affirmed where lenient escort let prisoner go to bathroom unescorted: temporary relaxation of vigilance was no "abrogation of status as a restrainer"); *United States v. Humphrey,* 28 B.R. 327 (1943) (moral not substitute for physical) (fence around installation enclosed 28 square miles, was not equivalent to physical confinement); *United States v. Medlock,* 14 B.R. 69 (1942) (no escape where prisoner was sent out of jail unescorted and unobserved to wash pails in lake, did not return); *United States v. Lowry,* 12 B.R. 309, 311 (1942) (requirement for physical restraint is intended to exclude conviction for escape of prisoner who is paroled to work, does not return) (prisoner in hospital was, according to "very common understanding," not supposed to leave. Not good enough.); *United States v. Smith,* 5 B.R. 155 (1934) (no escape where prisoner did not return when detailed to work outside the jail without supervision) (no "break

find it wiser to insist on proof of the element as the law requires than to infer it by such flimsy logic.

## V. THE RECORD

We now turn to the colloquy during the inquiry into the providence of the pleas of guilty. Before we begin, we must set aside what is *not* relevant: It is *not* relevant that Airman Felix knew of the local regulation or that it imposed limits on his liberty. The regulation and his knowledge of it tend to prove only that he was in custody imposed by the moral suasion resulting from a duty to obey. The fact that Airman Felix was induced to agree with the military judge's characterization of his state as "physical restraint" only helps keep this controversy in the majority's Aristotelian world. While this element can be confessed away, the central need in the providency inquiry is to assure that the accused knows what he's talking about when he does so. The inconsistent replies suggest that he didn't, and the military judge should have inquired further.[17]

The inquiries in this case focused on escape because that is what was alleged. However, the record does not make clear the circumstances of the correctional custody from which Airman Felix departed. We might not have questioned it, had Airman Felix not made three statements suggesting that the required "physical restraint" in that facility might have been absent. At one fleeting passage as to one of his two absences, he explains that he went out the facility's back door. There is no hint that any force or deception or a locksmith's skill was required, and so we cannot infer that Airman Felix was then under physical restraint. There is nothing to explain how he got out on the other occasion or the circumstances of the custody on that occasion. While Airman Felix gave the needed "Yes, sir" responses to the military judge's questions, it is clear that neither the military judge nor Airman Felix were discriminating between physical and moral restraint. Yet, in the one brief reference to the conditions of custody, Airman Felix said that he just walked out the door. Later, during sentencing, he told us that there was no security in the facility at all. Those replies are inconsistent with his agreement that he was under physical restraint. Such an inconsistency left unclarified causes a substantial conflict between the plea (guilty of escape from physical restraint) and Airman Felix' description of the circumstances of the correctional custody in his case (just walked out the door).

The participants at trial did not notice the distinctions between offenses against correctional custody and, naturally, did not notice the inconsistency and therefore did not resolve it. The plea was not shown to have been provident. The findings under Charge II should have been set aside.[18]

---

away from any physical restraint"); *United States v. Gilchrest*, 1 B.R. 297 (A.B.R.1930) (no "breaking away from physical restraint" where prisoner was sent unescorted outside the jail to fetch ice, did not return). *Maslanich* threw out the baby with the bath water. It simply assumed away the proof requirement as to physical custody because it found it too difficult to follow the precedent about prisoners who were outside the jail. It would have been better simply to require proof. Instead, the *Maslanich* court changed the doctrine to conform to its taste for simplicity and streamlined orderliness. That is exactly where we are in Airman Felix' case. The Court of Military Appeals has not visited the extremes to which the law of escape have been taken, but the present majority's insistence on taking the same view of escape from correctional custody gives it another chance.

**17.** This teapot-sized tempest is a superb example of the ripple effects of a trial judge's use during the providency inquiry of leading questions in which legal conclusions were embedded, calling upon the accused to subscribe to each. That style makes for a fast inquiry and a thin record, but it also seduces the participants into an assuredly false and obviously dangerous sense of security. If we may be excused a little speculation, we think it likely that if this trial judge had simply had a brief conversation with Airman Felix about life in this facility, we would never have had any cause to become so embroiled in such an unproductive controversy at such a great expense. Either the inconsistency would have been dispelled or, at the very worst, the prosecution would have been put to the test.

**18.** We have no opportunity to rescue this charge by approving a finding of guilty to a breach as if it were a lesser included offense, even though it is fairly apparent that, had breach been pleaded, the plea would likely have been provident. While moral suasion is less onerous than physi-

Article 45(a), UCMJ, 10 U.S.C. § 845(a) (1988).

## VI. THE MAJORITY'S REMEDY

Even if we were somehow disposed to accept the majority's view of escapes from correctional custody, we could not join its disingenuous disposition of this case. Airman Felix, though hardly a model airman, was convicted only of the escape which the majority now affirms and the disobedience of the local correctional custody regulation, which we all agree must be set aside. For those two convictions he was sentenced to a bad-conduct discharge, confinement for 5 months, and reduction to E-1 from E-2. To remedy a wrongful conviction of half the charges in this case, the majority proposes now to reduce the confinement 20 percent to 4 months.

Holding as we do the view that the other conviction must also be set aside, we are not obliged to set down our view of what would constitute an appropriate remedy for the majority to decree, for we would necessarily set aside the whole sentence. Still, we can record the dire straits in which the majority finds itself. It can't bring itself to give meaningful relief for what all agree was a wrongful conviction. It ran out of remedial options that it finds acceptable.

Restoring the reduction would result in back pay, yet we cannot calculate the money value of such relief because we have no idea how long such a poorly disciplined airman might have remained in pay status on active duty. *See* Article 76a, UCMJ, 10 U.S.C. § 876a (1988) (required leave). In short, we can't tell how much relief would result from setting aside the reduction. Furthermore, reduction in grade is an appealing and somehow just punishment for the irresponsibility shown in this case, if like the majority one can find a sound

conviction resulting from it. Setting aside the punitive discharge would certainly be adequate (perhaps even excessive) compensation for the error and for whatever loss of liberty was attributable to it, but the majority has, for whatever reason, found that to be inappropriate.

Most trying in the whole process is the mandate of the Court of Military Appeals that, when reassessing a sentence to correct an error, we must first determine whether we can determine what the trial court "would probably have adjudged" had the error not occurred. *United States v. Peoples*, 29 M.J. 426, 427 (C.M.A.1990). *See also United States v. Sales*, 22 M.J. 305, 307–308 (C.M.A.1986); *United States v. Suzuki*, 20 M.J. 248, 249 (C.M.A.1985). *See generally, United States v. Waits*, 32 M.J. 274, 276–77 (C.M.A.1991). When we can't tell, we are not supposed to guess, as we think the majority does. We are supposed to remand.

That is a tricky bit of mind-reading in any case, but in some it is more sound logic than speculation. For example, we know that an officer-accused stands a very good chance of being dismissed from the service upon conviction of any substantial crime, and we are not surprised when we see dismissal alone adjudged and then approved even when only one of several convictions can be sustained on appeal. When we must reassess in such a case, we can often conclude, to the satisfaction of our conscience, that the dismissal was inevitable even had the affected specifications never been referred. In other cases a particular component of the sentence can be directly tied to a specification, as when the court-martial adjudges a fine in exactly the amount the accused was convicted of stealing. If the larceny conviction must be disapproved but others remain, we can tell at least that the fine should go.

cal imprisonment, a breach of custody is not necessarily a lesser included offense of an escape. *United States v. Greene*, 42 C.M.R. 953, 959, 1970 WL 7276 (A.F.C.M.R.1970), *rev'd on other grounds*, 20 U.S.C.M.A. 232, 43 C.M.R. 72, 1970 WL 7433 (1970). *But cf. Kellner*, 16 M.J. 524 (plea to escape found improvident in breach situation, breach affirmed where military judge's inquiry included breach); *United States v. Whitmire*, 13 M.J. 587 (N.M.C.M.R.1982)

(specification of escape amended at trial to allege breach). The two elements are different, not inclusive of one another. Unlike the military judge in *Kellner*, the military judge in this case did not advise Airman Felix about the elements of breach except superficially and did not inquire into facts about breach. Thus, the inquiry requirement would remain unsatisfied in either case.

This is not such a case. One cannot say reliably enough to satisfy my conscience that the escape alone produced the punitive discharge, the reduction, and 4 of the 5 months of confinement. The majority is simply guessing, and, to make it much worse, their guesswork is deplorably parsimonious.

The majority's remedy is neither adequate nor effective, because the appellant served all the confinement long ago and has presumably been released. The sentence was adjudged on 25 February 1991, now nearly 2 years ago, and only truly extraordinary circumstances would have prevented the confinement from being served. None of it should remain to be abated by the majority's ungenerous treatment. Thus, our appellate inefficiency gave the majority a Hobson's choice, and it chose nothing.

One might argue that there are collateral consequences to disapproving confinement already served, but we are unacquainted with them, they are not in the record, and we can only speculate what they might be and how reliable the government might be in delivering them up to the appellant. Ignoring them as we must, we can only conclude that the majority has tried to give back the one thing that can never be given back in a non-capital case: liberty deprived. It is a futile and tight-fisted gesture, inadequate to the purpose, and born of speculation. This case should be remanded for a rehearing on the sentence, even if one agrees with the majority's disposition of the convictions.[19]

JOHNSON, Judge, with whom Judge JAMES joins (concurring in part and dissenting in part):

I concur with the majority's decision to set aside appellant's conviction for failure

to obey a lawful order. I join Judge James in dissenting from the majority's decision to affirm appellant's convictions for escape from correctional custody, and from the majority's remedial action.[20]

Correctional custody is listed in Article 15(b)(2), UCMJ, as an authorized punishment for nonjudicial punishment actions, and it is there defined as "the physical restraint of a person during duty or nonduty hours...." This language can either be interpreted as meaning that a person ordered into correctional custody is therefore automatically under physical restraint, at least when he is in a designated correctional custody facility, or it can be read as an authorization for physical restraint to be imposed by competent authority. The majority has apparently taken the former view, with which I disagree.

Further, the term "physical restraint" may be taken to mean either physical means limiting one's movements (such as locked doors, fences, or the presence of an escort or monitor with the duty and means of limiting one's liberty), or it may be taken to mean the declaration of limits beyond which one may not go. The majority in this case seems to have adopted the latter view, with which I disagree.

The explanation of the offense of escape from correctional custody in MCM, Part IV, paragraph 70c(1) (1984) defines it as the casting off of "any physical restraint imposed by the custodian or by the place or conditions of custody." The words "conditions of custody" can be interpreted either as physical barriers to movement, or as orders not to depart from certain limits. The majority in this case seems to have adopted the latter view. I disagree.

In MCM, Part V, paragraph 5(c)(4) (1984), the President has authorized the Secre-

---

**19.** We refrain from detailing our disagreement with the majority's treatment of the identity of the staff judge advocate's ghostwriter. In our view, all that should matter is that the staff judge advocate signed the post-trial recommendations in such a way as to make clear that they were his own advice to the convening authority. Who served as scrivener or draftsman should be of no real significance.

**20.** I also agree that this was not an appropriate case for consideration *en banc* by this Court. Now that the majority of the Court has voted to consider appellant's case *en banc*, however, the merits of that question are not dispositive of our action on the findings and sentence in appellant's case.

taries of the service departments to prescribe the conditions under which correctional custody is to be administered in each service. The Secretary of the Air Force, in Air Force Regulation 125–35, *Correctional Custody* (4 September 1981), has given major commands and installation commanders wide discretion in establishing and operating correctional custody programs. Some Air Force installations have no correctional custody program, or send participants to other installations for correctional custody. Those installations that do have correctional custody programs vary considerably in the way they conduct their programs. Some have correctional custody facilities in separate buildings with locked doors, security fences, and monitors on duty around the clock. Others are simply portions of normal barracks marked off with tape or signs. The result is that some persons serving correctional custody have physical barriers to their freedom of movement, while others do not.

MCM, Part IV, paragraph 70b (1984), provides for two separate offenses against correctional custody. Escape from correctional custody applies when the offender has cast off physical restraint. Breach of correctional custody applies when an offender "went beyond the limits of the restraint imposed" without casting off a physical restraint. Escape carries a much heavier maximum punishment (dishonorable discharge, total forfeitures, and confinement for 1 year) than does breach of correction custody (bad-conduct discharge, total forfeitures, and confinement for 6 months).

The majority has decided that any offender who leaves a correctional custody facility without authority can be convicted of escape, even when the evidence indicates there was no physical barrier to movement. I believe this conclusion is contrary to law. If an accused has breached a moral restraint imposed by his placement into correctional custody, he can be convicted of breach of correctional custody. Before he can be convicted of the more serious offense of escape from correctional custody, he must have cast off some physical limit on his movement. If the government

charges the more serious offense, it should plead and prove the aggravating facts. When a military judge conducts a providency inquiry for a proposed plea of guilty to escape from correctional custody, he should inquire into the factual basis for the conclusion that physical restraint was present. When an accused says there was no security at all in the correctional custody facility, and that he just walked out the back door, as in this case, the military judge should recognize that the accused has raised matters inconsistent with a plea of guilty to escape. No amount of leading and conclusory questions will substitute for putting the facts on the record.

I would set aside all the findings of guilty in this case and authorize a rehearing on the two specifications of escape from correctional custody.